SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
1  Alan R. Plutzik, Of Counsel (Bar No. 077785)
2  Robert M. Bramson, Of Counsel (Bar No. 102006)
   2125 Oak Grove Road, Suite 120
3  Walnut Creek, California  94598
   Telephone:  (925) 945-0770
4  Facsimile:  (925) 945-8792
   (aplutzik@sbtklaw.com)
5  (rbramson@sbtklaw.com)

6  -and-

7  Joseph H. Meltzer, Esq. (jmeltzer@sbtklaw.com)
   Edward W. Ciolko, Esq. (eciolko@sbtklaw.com)
8  Joseph A. Weeden, Esq. (jweeden@sbtklaw.com)
   280 King of Prussia Road
9  Radnor, PA 19087
   Telephone: (610) 667-7706

10 RODDY KLEIN & RYAN
11 Gary Klein (klein@roddykleinryan.com)
   Shennan Kavanagh (kavanagh@roddykleinryan.com)
12 Kevin Costello (costello@roddykleinryan.com)
   727 Atlantic Avenue
13 Boston, MA  02111-2810
   Telephone:  (617) 357-5500 ext. 15
14 Facsimile:  (617) 357-5030

**FILED**

**MAY 3 0 2008**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

E-filing

15 [*Additional counsel listed on signature page*]

Attorneys for Plaintiffs and the Proposed Class

**C08-02735**

RS

ADR

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CLAUDIA P. SIERRA and LILLIAN SERGENTON, on behalf of themselves and all others similarly situated,** <br><br> Plaintiffs, <br><br> vs. <br><br> **FIRST FRANKLIN FINANCIAL CORPORATION,** <br><br> Defendant. | Case No. <br><br> **CLASS ACTION** <br><br> **CLASS ACTION COMPLAINT FOR:** <br><br> 1. **Violations of the Equal Credit Opportunity Act; 15 U.S.C. § 1691; and** <br><br> 2. Violations of the Fair Housing Act; 42 U.S.C. § 3601. <br><br> **JURY TRIAL DEMANDED** |

**ORIGINAL**

GO 44 SEC. :
NOTICE OF ASSIGNMENT
TO MAGISTRATE JUDGE SENT

CLASS ACTION COMPLAINT

## CLASS ACTION COMPLAINT

Plaintiffs Claudia P. Sierra and Lillian Sergenton ("Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned attorneys, allege as follows:

1.    This is a class action brought by Plaintiffs, on behalf of themselves and other similarly situated minority homeowners, against First Franklin Financial Corporation, ("Defendant" or "First Franklin"), under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, etseq. ("ECOA") and the Fair Housing Act, 42 U.S.C. § 3601 et seq. Plaintiffs seek remedies for themselves and the Class (defined in ¶ 108, below) for the discriminatory effects of the Defendant's home financing policies and practices.

2.    As described below, the Defendant has established a specific, identifiable and uniform credit pricing system, a component of which, referred to herein as the Discretionary Pricing Policy, authorizes unchecked, subjective surcharge of additional points and fees to an otherwise objective risk-based financing rate. In other words, after a finance rate acceptable to the Defendant is determined by objective criteria (e.g., the individual's credit history, credit score, debt-to-income ratio and loan-to-value ratios), the Defendant's credit pricing policy authorizes additional discretionary finance charges. These subjective, additional finance charges have a widespread discriminatory impact on minority applicants for home mortgage loans, in violation of ECOA and the FHA.

3.    The mortgage lending industry has a long history of racial discrimination, offering minorities products and terms that are drastically worse than those given to their similarly-situated white counterparts. Recently, the Federal Reserve Board confirmed that blacks and other minorities are still more likely to pay higher prices for mortgages than whites.

4.    In 2003, the National Community Reinvestment Coalition ("NCRC") released a report on credit discrimination titled, "The Broken System: Discrimination and Unequal Access to Affordable Loans by Race and Age,"[1] that indicated that consumers living in areas with more minority residents are more likely to have mortgages with interest rates higher than the "prevailing and competitive" rates, often because of discrimination in lending.

---

[1] This report is available at http://ncrc.org/policy/cra/documents/ncrcdiscrimstudy.pdf.

1    5.    Loan data that mortgage lenders must now compile and disclose under the federal
2  Home Mortgage Disclosure Act ("HMDA") reveals profound loan pricing disparities between
3  minority borrowers and similarly-situated white borrowers.  HMDA data for 2006 showed that
4  black and Hispanic borrowers are more likely to obtain higher-priced loans than are white
5  borrowers.  The data indicated that black homeowners who received subprime mortgage loans
6  were much more likely to be issued a higher-rate loan than white borrowers with the same
7  qualifications.

8    6.    In a speech last year, Martin J. Gruenberg, Vice Chairman of the Federal Deposit
9  Insurance Corporation observed that "previous studies have suggested higher-priced, subprime
10  lenders are more active in lower income, urban areas and that minority access to credit is
11  dominated by higher cost lenders."[2]

12    7.    In 2006, the Center for Responsible Lending, a non-profit research organization,
13  uncovered "large and statistically significant" differences between the rates of subprime loans
14  offered to blacks and whites, even when income and credit risk were taken into consideration.
15  Compared to their otherwise similarly-situated white counterparts, blacks were 31-34% more
16  likely to receive higher rate fixed-rate loans and 6-15% more likely to receive adjustable-rate
17  loans.[3]

18    8.    Subprime loans to blacks and other minorities not only impose higher interest
19  rates, they are typically laden with excessive, unreasonable and often improperly disclosed fees
20  as well. *See supra,* n.3.

21    9.    These significant disparities are not mere coincidences.  They are the result of a
22  systematic and discriminatory policy of targeting minority borrowers for high-cost loans.
23  Defendant's business practices include implementing and maintaining policies that discriminate
24  against minorities.  Plaintiffs bring this lawsuit to seek relief from the harms suffered as a result
25  of Defendant's practices and to enjoin Defendant from continuing its discriminatory practices.

26  [2] *See* Martin J. Gruenberg, FDIC Vice-Chairman, Address to the Conference on Hispanic
27  Immigration to the United States:  Banking the Unbanked Initiatives in the U.S. (Oct. 18, 2006)
    *available at* http://www.fdic.gov/news/news/speeches/archives/2006/chairman/spoct1806.html.
28  [3] *See* "Unfair Lending:  The Effect of Race and Ethnicity on the Price of Subprime Mortgages,"
    *available at* http://www.responsiblelending.org.

10.    The Defendant has established policies for retail and wholesale access to its loan products that subject minority financing applicants to a significantly higher likelihood of exposure to discretionary points and fees. These costs drive up the average cost of a mortgage loan made by the defendant to minority homeowners.

11.    Plaintiffs seek damages, declaratory and injunctive relief, disgorgement and restitution of monies disparately obtained from minority borrowers.

## JURISDICTION AND VENUE

12.    Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. §1331, which confers original jurisdiction upon this Court in a civil action arising under federal law.

13.    Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) because the Defendant maintains its principal executive offices in this District and because the practices complained of herein were structured and formulated in this District.

## PARTIES

14.    Plaintiff Claudia P. Sierra is a minority homeowner who resides in a condominium unit at 5 Condor Street #2, East Boston, MA 02128.

15.    Plaintiff Lillian Sergenton is a minority homeowner who resides at 5948 South King Drive, Unit #3, Chicago, IL 60637.

16.    Defendant First Franklin Financial Corporation is a mortgage lender with principal executive offices located at 2150 North First Street, San Jose, CA 95131.  Since being acquired by Merrill Lynch in December 2006, Defendant First Franklin Financial Corporation has acted as an operating subsidiary of Merrill Lynch Bank & Trust Co., F.S.B.  Prior to its acquisition by Merrill Lynch, Defendant First Franklin Financial Corporation was a division of National City Bank of Indiana, a federally chartered bank and wholly owned subsidiary of National City Corporation.

1

## FACTS

2

3

**A.    MORTGAGE LENDERS HAVE A HISTORY OF DISCRIMINATION AGAINST MINORITY BORROWERS**

4      17.    According to the Joint Center for Housing Studies at Harvard University's 2005

5   study called "The Dual Mortgage Market:  The Persistence of Discrimination in Mortgage

6   Lending," mortgage lending discrimination today is subtle but pervasive, with minority

7   consumers continuing to have less-than-equal access to loans at the best price and on the best

8   terms that their credit history, income, and other individual financial considerations merit more

9   than three decades after the enactment of national fair lending legislation.

10      18.    The passage of civil rights legislation and fair lending laws in the 1960s and

11   1970s brought an end to the most virulent forms of overt racial discrimination in the housing

12   markets, but throughout the 1980s and 1990s, mortgage lenders found more subtle ways to

13   discriminate, including maintaining offices only in white neighborhoods and engaging in

14   practices such as redlining (refusing to lend on properties in predominantly minority

15   neighborhoods).

16      19.    After such redlining practices were challenged in the 1990s, mortgage lenders

17   changed tactics once again, making loans to minorities, but charging higher interest rates and

18   loan-related fees than they charged to similarly situated white borrowers.

19      20.    As noted above, HMDA requires mortgage lenders to report information about the

20   home loans they process each year.  In 2005, lenders reported information on more than 30

21   million home loan applications pursuant to HMDA.  In 1989, Congress required lenders to begin

22   disclosing information about mortgage borrowers' race and ethnicity.  In 2004, concerned with

23   potential racial discrimination in loan pricing and recognizing that racial or other types of

24   discrimination can occur when loan officers and mortgage brokers have latitude in setting

25   interest rates, the Federal Reserve Board began requiring lenders to also report information

26   concerning rates, points, and fees, charged to borrowers on high-cost loans.

27      21.    According to the Federal Reserve, both 2004 and 2005 HMDA data revealed that

28   "Blacks and minority borrowers were more likely . . . to have received higher-priced loans than

1  non-Hispanic whites ... [which has] increased concern about the fairness of the lending
2  process."[4]

3      22.    HMDA data for 2004 reveals profound loan pricing disparities between minority
4  borrowers and non-Hispanic whites even after controlling for borrowers' gender, income,
5  property location, and loan amount. After accounting for those differences in the 2004 HMDA
6  data, minority borrowers were still almost twice as likely to receive a higher-rate home loan as
7  non-Hispanic whites.[5]

8      23.    Likewise, HMDA data for 2005 shows that "for conventional home-purchase
9  loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2
10  percent for non-Hispanic whites, a difference of 37.5 percentage points." Avery, *supra* n.4, at
11  A159. The situation is similar for refinancing, where there is a difference of 28.3 percentage
12  points between blacks and non-Hispanic whites. *Id.* at A124, A159.

13      24.    Since 2003, Defendant has not separately reported its own loan data under
14  HMDA. Plaintiffs believe that Defendant's loan data for the years 2004 through 2006 was
15  reported together with that of National City – which shows that minority borrowers were about
16  twice as likely to receive a high-cost loan as white borrowers.[6] For example, while only 11% of
17  white National City borrowers received high-cost loans in 2004, 24% of its black borrowers

18

19  [4] Robert B. Avery, Kenneth P. Brevoort and Glenn B. Canner, "Higher-Priced Home Lending
    and the 2005 HMDA Data," Federal Reserve Bulletin, A124, A159 (revised Sept. 18, 2006)
20  *available at* http://www.federalreserve.gov/pubs/bulletin/2006/hmda/bull06hmda.pdf.
    [5] Testimony of Keith Ernst to congressional subcommittee on Financial Institutions and
21  Consumer Credit, at 2 (June 13, 2006), *available at*
    http://www.responsiblelending.org/pdfs/Testimony-Ernst061306.pdf
22  [6] According to the website of the Federal Reserve Board, lenders are required to report the
    percentage of loans that have rate spreads that exceed its high price threshold. *See* "Answers to
23  Frequently Asked Questions About HMDA Price Data" (available at
    http://www.federalreserve.gov/newsevents/press/bcreg/20060403a1.pdf). The rate spread is the
24  difference between a particular loan's Annual Percentage Rate ("APR") and the rate on Treasury
    securities of comparable maturity. *Id.* at 3-4. The APR is an effort to measure the true cost of
25  the loan by accounting not just for the interest rate on the loan, but also of the points, fees and
26  other miscellaneous charges to the consumer. *Id.* at 4. In order to exceed the high-price
    threshold for first-lien loans, a loan's APR must be in excess of 3 percentage points higher than
27  Treasury securities of comparable maturity. *Id.* In order to exceed the high-price threshold for
28  second-lien loans, a loan's APR must be in excess of 5 percentage points higher than Treasury
    securities of comparable maturity. *Id.*

CLASS ACTION COMPLAINT                                                              5

1   received such loans that year. Cumulatively between 2004 and 2006, the percentage of all

2   minority homeowners receiving high-cost National City loans was 48%, while the percentage of

3   white borrowers receiving such loans was 27%. These numbers conform generally to the

4   differences found by researchers industry-wide.

5       25.    The Association of Community Organizations for Reform Now (ACORN)

6   released a report entitled "The High Cost of Credit: Disparities in High-priced Refinanced Loans

7   to Minority Homeowners in 125 American Cities," dated September 27, 2005, that found that

8   "[i]n every metropolitan area where at least 50 refinances were made to African-American

9   homeowners, African-Americans were more likely to receive a high-cost loan than White

10  homeowners."

11      26.    The ACORN study found that, nationally, black home purchasers were 2.7 times

12  more likely and Hispanics were 2.3 times more likely than white borrowers to be issued a

13  problematic, subprime loan. Additionally, the ACORN study found that nationally, for refinance

14  loans, African Americans were 1.8 times more likely and Hispanics were 1.4 times more likely

15  than white borrowers to be issued a problematic, subprime loan.

16      27.    Differences in economic status are not to blame. These racial disparities were

17  found to persist even among borrowers of the same income level. The ACORN study found that,

18  among upper-income purchasers (defined as persons with incomes 120% or greater than the area

19  median income for their metropolitan area), blacks were 3.3 times more likely and Hispanics

20  were 3 times more likely than similarly-situated whites to be issued a high-cost, subprime loan.

21  Further, the ACORN study found that, with respect to refinance loans, among upper-income

22  borrowers, blacks and Hispanic borrowers were 1.7 times were likely than similarly-situated

23  whites to be issued a high-cost, subprime loan.

24      28.    While some borrowers in the subprime market are genuine credit risks, minority

25  borrowers have been preyed upon by mortgage lenders and illegally steered into subprime loans.

26  Defendant has engaged in this discriminatory lending by refusing to offer minority borrowers the

27  prime loans offered to similarly-qualified white borrowers.

28

29.     Studies by Freddie Mac and Standard & Poor's have found that 20% to 30% of borrowers who receive subprime mortgages could have qualified for traditional mortgages at the lower rates offered by banks to prime borrowers. This seriously disadvantages the borrower by effectively diluting the equity of the property, placing the borrower in jeopardy of default, and forcing the borrower to spend years paying off additional loan balances without developing any equity in their home.

30.     Further, the U.S. Department of Housing and Urban Development found that in neighborhoods where at least 80 percent of the population is black, borrowers were 2.2 times as likely as borrowers in the nation as a whole to refinance with a subprime lender. Higher-income borrowers living in predominately blacks neighborhoods are twice as likely as lower-income white borrowers to have subprime loans.[7]

31.     The predatory lending practices of the Defendant and other mortgage lenders lead to dire financial consequences for borrowers. Earlier this year, over eighty consumer groups wrote to federal banking agencies about a particular type of subprime loan, 2/28 the adjustable rate mortgage ("2/28 ARM"). A 2/28 ARM typically contains an average built-in "shock payment" increase of 29%, even if interest rates remain unchanged. Fitch Ratings reports that the actual payment shock may be as high as 48%. The majority of subprime loans made to minorities had these adjustable rates. The Center for Responsible Lending estimates that 2.2 million such subprime loans have ended or will end in foreclosure, a rate of 19%.

32.     Plaintiffs Claudia P. Sierra and Lillian Sergenton have loans with the 2/28 ARM structure.

33.     The Center for Responsible Lending ("CRL") published a study in December 2006 on the effects of foreclosure.[8] The report states that the costs of subprime foreclosures fall heavily on black and Hispanic homeowners, since subprime mortgages are disproportionately made in communities of color. HMDA data shows that over half of loans to black borrowers are

[7] See U.S. Department of Housing and Urban Development, Office of Policy Development and Research, "All Other Things Being Equal: A Paired Testing Study of Mortgage Lending Institutions," (2002) available at http://www.huduser.org/publications/hsgfin/aotbe.html.
[8] See "Losing Ground: Foreclosures in the Subprime Market and Their Cost to Homeowners." December 2006, available at http://www.responsiblelending.org.

1  higher-cost loans, which, by definition, are a proxy for subprime loans. For Hispanic

2  homeowners, the portion of higher-cost loans is also very high, at four in ten. This data implies

3  that subprime foreclosures will affect eight percent of recent Hispanic borrowers and 10 percent

4  of recent black borrowers. By comparison, subprime foreclosures will likely occur among only

5  about four percent of recent white borrowers.

6      34.     CRL released an additional study in November, 2007 that explains the negative

7  effects of foreclosure as extending beyond individual families losing their homes and into

8  surrounding neighbors and the wider community.[9] The 2007 study reports that a foreclosure on a

9  home lowered the price of other nearby single-family homes, on average, by 0.9 percent. That

10  impact was even higher in lower-income neighborhoods, where each foreclosure dropped home

11  values by an average of 1.44 percent. The study notes that communities of color will be

12  especially harmed, since these communities receive a disproportionate share of subprime home

13  loans.

14      35.     The 2007 CRL study projects that, nationally, foreclosures on subprime home

15  loans originated in 2005 and 2006 will have numerous impacts on the neighborhoods and

16  communities in which they occur. For instance, the study predicts that 44.5 million neighboring

17  homes will experience devaluation because of subprime foreclosures that take place nearby, and

18  the total decline in house values and tax base from nearby foreclosure will be about $223 billion.

19  Homeowners living near foreclosed properties will see their property values decrease $5,000 on

20  average.

21      36.     A growing number of research studies and investigations show that significant

22  racial disparities still exist in home mortgage lending.[10]

23

24  _____

[9] *See* "Subprime Spillover: Foreclosures Cost Neighbors $223 Billion; 44.5 Million Homes Lost

25  $5,000 on Average." Center for Responsible Lending, *available at*
http://www.responsiblelending.org.

26  [10] *See, e.g.,* California Reinvestment Coalition, et al., *Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending*, (March 2007) (hereinafter 2007

27  CRC Report") *available at* http://www.nedap.org/pressroom/documents/2007_Report-
2005_HMDA.pdf, (hereinafter "2007 CRC Report"); Stephen L. Ross, *The Continuing Practice*

28  *and Impact of Discrimination*, (Revised July 2006) (Univ. of Connecticut, Working Paper 2005-
19R), *available at* http://www.econ.uconn.edu/working/2005-19r.pdf.

37.     Moreover, and importantly, research studies have suggested that borrowers' credit profiles cannot fully explain why some borrowers, and not others, are saddled with higher cost loans. Researchers have raised "doubts that risk can adequately explain racial differences" in high-cost loans.[11] In other words, evidence "suggests that weak borrower credit profiles do not fully explain why some borrowers get stuck with higher-cost home loans."[12]

38.     Borrowers who obtain a home loan at an unnecessarily high interest rate will pay hundreds of dollars more each month in mortgage payments, making them more vulnerable to short term economic distress that may result from job loss or medical problems. In consequence, minority homeowners run higher risks of foreclosure, and will accumulate equity in their homes much more slowly than white borrowers. While for some minority borrowers with tarnished credit histories, higher-priced home loans provide the only access to the mortgage market and to homeownership, many other minorities will be paying far more for their mortgages than their credit histories justify.

39.     The skyrocketing levels of foreclosures in urban areas, and minority communities in particular, have been tied to the growth of concentrated subprime lending in these areas.[13] Concentrated foreclosures have a devastating impact on cities and neighborhoods. They affect local property values, serve as a magnet for crime, and hurt a city's property tax base.[14]

40.     While many institutions specialize in lending to either prime or subprime markets, there is an important set of large lenders that are active in both markets. These lenders utilize

---

[11] Calvin Bradford, Center for Community Change, *Risk or Race? Racial Disparities and the Subprime Refinance Market,* (May 2002), *available at* http://www.knowledgeplex.org/kp/report/report/relfiles/ccc_0729_risk.pdf.
[12] 2007 CRC Report, *supra* at 7.
[13] Dan Immergluck and Geoff Smith, *Risky Business: An Econometric Analysis of the Relationship Between Subprime Lending and Foreclosures,* (March 2004), Woodstock Institute, Chicago, IL.
[14] For discussions of the external impacts of foreclosures, *see* Dan Immergluck and Geoff Smith, *There Goes the Neighborhood: The Effect of Single-Family Mortgage Foreclosures on Property Values* (June 2005), Woodstock Institute, Chicago, IL; November 2006; Dan Immergluck and Geoff Smith, *The Impact of Single Family Foreclosures on Neighborhood Crime,* in *Housing Studies,* (November 2006); and William Apgar, Mark Duda, and Rochelle Nawrocki Gorey, *The Municipal Costs of Foreclosures: A Chicago Case Study,* (February 2005), Foreclosure Prevention Foundation, Minneapolis, MN.

diverse lending channels such as branch, broker and correspondent networks that allow them to reach a wide variety of geographic markets.  Their size also gives them the capacity to offer an array of products that may be appropriate for customers with different levels of credit quality.

**B.    THE DEFENDANT'S DISCRETIONARY PRICING POLICY CONTINUES THE PERVASIVE DISCRIMINATION AGAINST MINORITIES IN MORTGAGE LENDING**

41.    Defendant First Franklin is among America's leading mortgage lenders, originating and funding mortgage loans through loan officers, through authorized mortgage brokers and through a network of correspondent lenders.

42.    On information and belief, these loan officers, mortgage brokers and correspondent lenders work with Defendant to broker and fund loans in collaboration with Defendant and in conformity with Defendant's credit-pricing policies and procedures.As part of Defendant's underwriting process, loan application and appraisal packages are reviewed to ensure conformity with the its stated credit guidelines.

43.    Defendant has established, implemented and continues to implement its Discretionary Pricing Policy, causing minority borrowers to pay subjective fees such as yield spread premiums and other mortgage-related finance charges at higher rates than similarly situated non-minority borrowers.

44.    Due to the Defendant's policies as to where to place their offices and how to market their products, minority borrowers were more likely than white borrowers to obtain subprime loans on a wholesale basis rather than loans originated directly without the fees and costs associated with wholesale lending..

45.    Defendant's subprime loans originated in its wholesale channel are more expensive than loans originated directly on a retail basis to borrowers with the same or similar credit scores.

46.    The Defendant's Discretionary Pricing Policy is unrelated to a borrower's objective credit characteristics such as credit history, credit score, debt-to-income ratio and loan-to-value ratios and results in purely subjective charges that affect the rate otherwise available to borrowers.

1    47.    The Defendant provides its loan officers, authorized mortgage brokers and

2    correspondent lenders with substantial information about its loan programs, rates and credit

3    criteria, as well as its policies for compensating its loan officers and mortgage brokers who

4    arrange business for it.

5    48.    The Defendant authorizes loan officers, authorized mortgage brokers and

6    correspondent lenders to accept applications on its behalf, to quote financing rates and terms

7    (within the limitations set by Defendant), to inform credit applicants of Defendant's financing

8    options and to originate finance transactions using Defendant's forms, in accordance with its

9    policies.

10    49.    Defendant provides its loan officers, authorized mortgage brokers and

11    correspondent lenders with credit applications, loan contracts and other required financing forms,

12    as well as instructions on filling out such documents necessary to complete home mortgage

13    transactions.

14    50.    After a customer provides credit information to one of Defendant's loan officers,

15    authorized mortgage brokers and/or correspondent lenders, Defendant computes a financing rate

16    through an objective credit analysis that, in general, discerns the creditworthiness of the

17    customer.

18    51.    These credit analyses consider numerous risk-related variables of

19    creditworthiness, including credit bureau histories, payment amounts, debt ratio, bankruptcies,

20    automobile repossessions, charge-offs, prior foreclosures, payment histories, credit score, debt-

21    to-income ratios, loan-to-value ratios and other risk-related attributes or variables.  On

22    information and belief, Defendant uses these variables to determine a "mortgage score" for each

23    credit applicant.

24    52.    Based on these objective risk-related variables and the resulting mortgage score,

25    Defendant derives a risk-based financing rate at which it would provide a home mortgage, often

26    called the "Par Rate."  Alternatively, experienced loan officers, authorized mortgage brokers

27    and/or correspondent lenders can estimate the risk-related Par Rate by referring to the applicant's

28    credit bureau determined credit score.

1    53.    Although Defendant's initial analysis applies objective criteria to calculate this

2 risk-related interest rate, Defendant's Discretionary Pricing Policy authorizes its loan officers,

3 brokers and correspondent lenders to mark up that rate later and also impose additional non-risk-

4 based charges, including yield spread premiums, and discretionary fees. Defendant regularly

5 communicates applicable par rates, authorized yield spread premiums, and other discretionary

6 fees to its loan officers, brokers and correspondent lenders via "rate sheets" and other

7 communications.

8    54.    Defendant gives its loan officers, authorized mortgage brokers and/or

9 correspondent lenders discretion to impose yield spread premiums and other subjective fees on

10 borrowers. When borrowers pay yield spread premiums, Defendant shares in additional income

11 generated by the premium because the yield spread premium-affected borrower is locked into a

12 higher interest rate going forward on their loan than they would be if they had been placed in a

13 par rate loan without a yield spread premium.

14    55.    Defendant's borrowers pay yield spread premiums and other discretionary fees

15 that inflate their finance charges not knowing that a portion of their finance charges are non-risk-

16 related.

17    56.    The discretionary charges are paid by the customer as a component of the total

18 finance charge (the "Contract APR"), without the homeowner knowing that a portion of their

19 contract APR was a non-risk-related charge.

20    57.    Defendant's brokers have discretion, within the limits set by the Defendant, to

21 impose discretionary mark-ups as additional points in interest – "a rate mark-up", or as points

22 and fees, such as yield spread premiums, on the loan. When there is a rate mark-up, the

23 Defendant receives additional income.

24    58.    The Defendant's Discretionary Pricing Policy, by design, causes persons with

25 identical or similar credit scores to pay different amounts for the cost of credit. As a result of

26 using a subjective pricing component that is designed to charge persons with the same credit

27 profiles different amounts of finance charge, the objective qualities of the initial credit analysis

28

1  used to calculate the Par Rate are undermined and the potential for race bias becomes inherent in
2  the transaction.

3      59.    The Discretionary Pricing Policy, although facially neutral (insofar as the
4  Defendant uses the same or effectively the same policy for all credit applicants), has a
5  disproportionately adverse effect on minorities compared to similarly situated whites in that
6  minorities pay disparately more discretionary charges (both in frequency and amount) than
7  similarly situated whites. Statistical analysis of discretionary charges imposed on minority and
8  white customers of other mortgage companies that use credit pricing systems structured like that
9  of the Defendant has revealed that minorities, after controlling for credit risk, are substantially
10  more likely than similarly situated whites to pay such charges.

11      60.    Brokers and correspondent lenders are agents of the Defendant for the purpose
12  of setting credit price, which is always set based on the Defendant's policy.

13      61.    The disparate impact suffered by minorities is a direct result of the Defendant's
14  Discretionary Pricing Policy in that the Defendant designed, disseminated, controlled,
15  implemented and profited from the Discretionary Pricing Policy creating the disparate impact.

16      62.    The Defendant has a non-delegable duty to ensure that its mortgage financing
17  structure and policies do not have a disparate impact on legally protected classes, such as
18  minorities. Despite having such a non-delegable duty, the Defendant has chosen to use, and on
19  information and belief, continues to use, a commission-driven, subjective pricing policy that it
20  knows or should have known has a significant and pervasive adverse impact on minority
21  homeowners.

22      63.    The disparities between the terms of the Defendant's transactions involving
23  minority homeowners and the terms involving whites homeowners cannot be a product of chance
24  and cannot be explained by factors unrelated to race, but, instead, are the direct causal result of
25  the use of the discriminatory Discretionary Pricing Policy.

26      64.    Which lending channel a borrower enters – prime or subprime – has a large
27  impact on the price she will pay for her home loan. By funneling minority borrowers into the
28  subprime channel, the Defendant discriminates against those borrowers.

65.     There are no legitimate business reasons justifying the Defendant's discriminatory Discretionary Pricing Policy that could not be achieved by a policy that has no discriminatory impact or a greatly reduced discriminatory impact.

## C.    THE DEFENDANTS' DISCRETIONARYPRICING POLICY DISCRIMINATED AGAINST PLAINTIFFS

*Facts relating to Plaintiff Claudia P. Sierra*

66.     Plaintiff Claudia P. Sierra ("Ms. Sierra") is a Hispanic homeowner who resides in a condominium unit at 5 Condor Street #2, East Boston, MA 02150.

67.     Ms. Sierra purchased this home on or about March 8, 2007 and obtained financing from Defendant.

68.     Mortgage Trust Group brokered the loan.

69.     On March 8, 2007, Ms. Sierra entered into a mortgage finance transaction with Defendant as the lender.  The transaction was divided into an "80/20" structure with two loans.

70.     Ms. Sierra's first loan (Loan No. 4001320087) was a 30-year adjustable rate loan with a disclosed APR of 10.5478% and an introductory note rate of 8.15%. The loan amount was $228,000.00. According to the note, the loan had a 2-year fixed rate followed by a 28-year variable rate feature in which the interest rate was recalculated every six months to be 5.4% above the six-month London Interbank Offered Rate as published in the Wall Street Journal.  At the end of the thirty-year term of the loan, Ms. Sierra is responsible for a balloon payment of $153,400.47.

71.     According to the HUD-1 Settlement Statement, Ms. Sierra paid $8,602.35 in settlement charges in connection with the loan, including a $695.00 Administrative Fee, and a $72.00 Tax Service Fee to Defendant.  Also included in the settlement charges were a $450.00 Processing Fee, a $330.00 Application Fee and $2850.00 Broker Fee paid to Mortgage Trust Group.

72.     In connection with the loan, Defendant also paid Mortgage Trust Group a yield spread premium in the amount of $2736.00 representing additional commission based on a marked up rate.

73.     True and correct copies of the Truth-in-Lending disclosure and HUD-One Settlement Statement provided in connection with Loan No. 4001320087 are attached hereto and labeled Exhibit 1 and Exhibit 2, respectively.

74.     Ms. Sierra's smaller loan (Loan No. 4001320088) was a fifteen-year fixed rate mortgage in the amount of $57,000.  The smaller loan had an APR of 11.4054% and a note rate of 11.15%.  At the end of the fifteen-year term, Ms. Sierra is responsible for a balloon payment of $48,481.54.

75.     True and correct copies of the Truth-in-Lending disclosure and HUD-One Settlement Statement provided in connection with Loan No. 4001320088 are attached hereto and labeled Exhibit 3 and Exhibit 4, respectively

76.     On information and belief, unbeknownst to Ms. Sierra, the contract APR on the mortgage loan was actually a combination of an objective, risk-based calculation and a totally subjective, discretionary component added pursuant to the Defendant's Discretionary Pricing Policy.

77.     On information and belief, Ms. Sierra was subject to the Defendant's Discretionary Pricing Policy.

78.     On information and belief, Ms. Sierra was charged a disproportionately greater amount in non-risk-related credit charges than similarly situated white persons.

79.     Ms. Sierra was not offered less expensive loan products that were available to borrowers with their credit characteristics directly under the Defendants' policies.

*Facts relating to Plaintiff Lillian Sergenton*

80.     Plaintiff Lillian Sergenton is a minority homeowner who resides at 5948 South King Drive, Unit #3, Chicago, IL 60637.

81.     Ms. Sergenton purchased this home on or about December 15, 2005 and obtained financing from Defendant.

82.     American Home Mortgage Corp. brokered the loan.

83.     On December 15, 2005, Ms. Sergenton entered into a mortgage finance transaction with Defendant as the lender, Loan No. 4000583296.

84.     Ms. Sergenton's loan was a 30-year loan with a disclosed APR of 11.2968% and a note rate of 9.6250%. The loan amount was $241,000.00. According to the note, the loan had a 2-year fixed rate followed by a 28-year variable rate feature in which the interest rate was recalculated every six months to be 6.75% above the six-month London Interbank Offered Rate as published in the Wall Street Journal.

85.     According to the HUD-1 Settlement Statement, Ms. Sergenton paid $8,520.62 in settlement charges in connection with the loan, including, a loan origination fee of $2410.00 to the broker and a $699.00 administrative fee, $200.00 appraisal review fee, a $69.00 Tax Service Fee a $23.00 Flood Certificate fee and a $15.00 compliance Review Fee to Defendant.  The broker also received a $275.00 Appraisal Fee paid outside of closing.

86.     In connection with the loan, Defendant also paid American Home Mortgage Corp. a fee of $2410.00 bearing the characteristics of a yield spread premium, representing additional commission based on a marked up rate.

87.     True and correct copies of the Truth-in-Lending disclosure and HUD-One Settlement Statement provided in connection with the Loan are attached hereto and labeled Exhibit 5 and Exhibit 6, respectively.

88.     On information and belief, unbeknownst to Ms. Sergenton, the contract APR on the mortgage loan was actually a combination of an objective, risk-based calculation and a totally subjective, discretionary component added pursuant to the Defendant's Discretionary Pricing Policy.

89.     On information and belief, Ms. Sergenton was subject to the Defendant's Discretionary Pricing Policy.

90.     On information and belief, Ms. Sergenton was charged a disproportionately greater amount in non-risk-related credit charges than similarly situated white persons.

91.     Ms. Sergenton was not offered less expensive loan products that were available to borrowers with their credit characteristics directly under the Defendants' policies.

## ALLEGATIONS OF NON-DISCLOSURE – FRAUDULENT CONCEALMENT (TOLLING)

92.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

93.     While long suspected, mortgage lending discrimination has only recently been disclosed and quantified. It has only been in the last few years that mortgage lenders have been required to submit details of their subprime home loans under the Home Mortgage Disclosure Act. The groups that have studied predatory lending and the mortgage market have uncovered incredible racial disparities in the types of mortgages offered.

94.     The causes of action alleged herein accrued upon discovery of the discriminatory impact of the Defendants' Discretionary Pricing Policy. Plaintiffs and members of the Class did not discover and could not have discovered through the exercise of reasonable diligence the factual bases of those claims. Moreover, because the Defendant knowingly and actively concealed the facts alleged herein, Plaintiffs and the Class have been kept ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

95.     Commission-driven, discretionary pricing systems, such as those used in the mortgage industry and structurally similar to the system utilized by the Defendant, have been found to produce significant discriminatory effects. Knowledge concerning the significant and pervasive discriminatory impact of such commission-driven, discretionary credit pricing systems has been widely circulated within the financing industry for several years, as a result of numerous actions by the United States Department of Justice and federal regulatory agencies. Thus, the Defendant knew or should have known that its credit pricing system causes minority homeowners to pay more for mortgage financing than the amounts paid by white customers with identical or effectively identical credit scores.

96.     Despite the fact that the Defendant knew or should have known of the discriminatory effect of its Discretionary Pricing Policy, none of the loan documents inform the customer that its finance rates ultimately are subjective and not based solely on risk-related characteristics.

1    97.    The Defendant was and is under a continuous non-delegable duty to disclose to
2  the Plaintiffs and Class material information regarding their loans.  The fact that certain loan
3  terms are subjective and discretionary is information a reasonable borrower would consider
4  important when deciding whether to accept the loan and on what terms.  The fact that the
5  subjective and discretionary components result in a disparate impact on minorities is also
6  information a reasonable minority borrower would consider important.

7    98.    The Defendant took affirmative steps to conceal their Discretionary Pricing Policy
8  and its affects including, without limitation, by conflating the discretionary and non-
9  discretionary elements of the credit price in various loan documents, by disclosing the
10  discretionary elements of the price as if they are non-discretionary, by failing to inform
11  borrowers that yield spread compensation is based on a mark-up of the finance charge from
12  which Defendant yields additional profits, and by generating excessive and confusing
13  documentation for each loan that prevents borrowers from understanding the fundamental terms
14  and costs of the loan at the time of closing.

15    99.    Plaintiffs and Class Members reasonably relied upon the Defendant's
16  representation that the terms of their loans would be based on their creditworthiness and on
17  various implied representations that all material information about the credit price is disclosed.

18    100.    The Defendant's financing documents falsely fostered the image that the
19  Defendant offers competitive rates that objectively are set.  However, the Defendant never
20  disclosed to its credit applicants the fact that: (a) its credit rates are subjective and can vary
21  significantly among persons with identical credit profiles; and (b) it had authorized and provided
22  a financial incentive to mortgage brokers to subjectively increase the credit rate above the rate
23  otherwise available to the homeowner.

24    101.    Due to the inherent nature of the Defendant's undisclosed Discretionary Pricing
25  Policy and due to the Defendant's deception and concealment, the Defendant's minority
26  customers had no way of knowing or suspecting: (a) the existence of the Defendant's subjective
27  credit pricing policy; (b) that they were charged additional subjective credit charges;  (c) that

28

1  they were charged a disproportionately greater amount for their cost of credit than similarly

2  situated white persons, and or (d) that any part of the loan price was negotiable.

3      102.    The Defendant was or should have been aware that the Discretionary Pricing

4  Policy had a disparate impact on minority borrowers. Even in the face of this information, the

5  Defendant continued affirmatively to authorize the use of the Discretionary Pricing Policy

6  without disclosure to its borrowers.

7      103.    The Defendant profited from the use of the Discretionary Pricing Policy.

8      104.    Given the "teaser rate" structure of many of the loans offered by the Defendant, it

9  is apparent that the products were designed to ensure that the loans would need to be refinanced

10  before their maturity date, requiring that borrowers expose themselves repeatedly to the

11  Discretionary Pricing Policy and thereby allowing Defendant to obtain further profits based on

12  the Discretionary Pricing Policy.

13      105.    The Defendant authorized its brokers and closing agents to withhold from

14  Plaintiffs information regarding the Discretionary Pricing Policy.

15      106.    Thus, the Defendant is estopped from relying on any statutes of limitation in its

16  defenses of this action.

17                          **CLASS ALLEGATIONS**

18      107.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

19      108.    This class action is brought pursuant to ECOA and the FHA by the individual

20  named Plaintiffs on behalf of themselves and all minority consumers (the "Class") who obtained

21  home mortgage loan from the Defendant in the United States between January 1, 2001 and the

22  date of judgment in this action (the "Class Period") and who were subject to the Defendant's

23  Discretionary Pricing Policy pursuant to which they paid discretionary points, fees or interest

24  mark-ups in connection with their loan. The term "minority" refers to blacks and Hispanics as

25  defined by federal law.

26      109.    Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules

27  23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

28

110.    The phrase "Discretionary Pricing Policy" refers to the Defendant's policy of authorizing its loan officers, correspondent lenders and brokers to impose subjective, discretionary charges and interest mark-ups that are included in the finance charge for loans they originate.

111.    Plaintiffs do not know the exact size or identities of the proposed Class, since such information is in the exclusive control of the Defendant. Plaintiffs believe that the Class encompasses many thousands or tens of thousands of individuals who are geographically dispersed throughout the United States. Therefore, the proposed class is so numerous that joinder of all members is impracticable.

112.    All members of the Class have been subject to and affected by Defendant's practice of assessing yield spread premiums and other discretionary fees on mortgage loans. There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

    a.    the nature and scope of Defendant's policies and procedures concerning the assessment of yield spread premiums and other discretionary fees on mortgage loans it funds;

    b.    whether First Franklin Financial Corporation is a creditor under the ECOA because, for example, in the ordinary course of its business it participates in the decision of whether or not to extend credit to consumers;

    c.    whether the Defendant's Discretionary Pricing Policy is a facially neutral credit pricing system that has effected racial discrimination in violation of ECOA;

    d.    whether there are statistically significant disparities between the amount of the discretionary charges  imposed on minority persons and the amount of the discretionary charges imposed on white persons that are unrelated to creditworthiness;

    e.    whether any legitimate business reason for the Discretionary Pricing Policy can be  achieved by a credit pricing system less discriminatory in its impact;

f.     whether the Court can enter declaratory and injunctive relief; and

g.     the proper measure of disgorgement and/or actual and/or punitive damages and/or restitution.

113.    The claims of the individual named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class, in that Plaintiffs and the other members of the Class were subjected to the same yield spread premiums and other discretionary fees that have disproportionately affected minority borrowers.

114.    The individual named Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the Class's claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection and discrimination actions.

115.    A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

116.    In the alternative, the Defendant acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

**COUNT I**
**DISCRIMINATION IN VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**

117.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

118.    The Defendant is a creditor as defined in ECOA.

119.    The Defendant designed, disseminated, controlled, implemented and profited from the discriminatory policy and practice alleged herein — the Discretionary Pricing Policy — which has had a disparate economic impact on minorities compared to similarly situated whites.

120.    All actions taken by the Defendant's loan officers, correspondent lenders and/or brokers were in accordance with the specific authority granted to them by the Defendant and were in furtherance of the Defendant's policies and practices.

121.    As a result of the Defendant's Discretionary Pricing Policy, the Defendant has collected more in finance charges from minorities than from similarly situated white persons, for reasons totally unrelated to credit risk.

122.    The Defendant's Discretionary Pricing Policy violates the Equal Credit Opportunity Act.

123.    Plaintiffs and prospective class members are aggrieved persons as defined in ECOA by virtue of having been subject to the discriminatory Discretionary Pricing Policy.

**COUNT II**
**DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT**

124.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

125.    Defendant engaged in residential real estate-related transactions with respect to the Plaintiffs, the proposed Class representatives herein, and all prospective Class members.

126.    The Defendant's Discretionary Pricing Policy has resulted in discrimination with respect to the Plaintiffs, the proposed Class representatives herein, and all prospective members of the Class.

127.    As a result of the Defendant's Discretionary Pricing Policy, the Defendant has collected more in finance charges from minorities than from similarly situated white persons, for reasons totally unrelated to credit risk.

128.    The Defendant's Discretionary Pricing Policy violates the Fair Housing Act and constitutes actionable discrimination on the basis of race.

129.    Plaintiffs and the Class are aggrieved persons as defined in FHA by virtue of having been subject to the Defendant's discriminatory Discretionary Pricing Policy.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.    Certify this case as a class action and certify the named Plaintiffs herein to be adequate class representatives and their counsel to be class counsel;

1    b.    Enter a judgment, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. §3613,

2  declaring the acts and practices of Defendant complained of herein to be in violation of ECOA

3  and the FHA;

4    c.    Grant a permanent or final injunction, pursuant to 15 U.S.C. 1691e(c) and/or 42

5  U.S.C. §3613(c), enjoining the Defendant, and the Defendant's agents and employees, affiliates

6  and subsidiaries, from continuing to discriminate against Plaintiffs and the members of the Class

7  because of their race through further use of the Discretionary Pricing Policy or any other non-

8  risk-related discretionary pricing policy employed by the Defendant and/or enjoining the

9  Defendant from continuing to collect charges resulting from discrimination;

10    d.    Order the Defendant, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. §3613(c),

11  to adopt and enforce a policy that requires appropriate training of the Defendant's employees and

12  its brokers and correspondent lenders to prevent discrimination;

13    e.    Order the Defendant, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. §3613(c),

14  to monitor and/or audit the racial pattern of its financings to ensure the cessation of

15  discriminatory effects in its home mortgage transactions;

16    f.    Order disgorgement, pursuant to 15 U.S.C. §1691e(c), of all disproportionate non-

17  risk charges imposed on minorities by the Defendant's Discretionary Pricing Policy; and order

18  the equitable distribution of such charges to all appropriate class members; together with other

19  relief for unjust enrichment;

20    g.    Order actual and punitive damages and/or restitution to the Plaintiffs and the

21  Class pursuant to 42 U.S.C. § 3613(c);

22    h.    Award Plaintiffs the costs of this action, including the fees and costs of experts,

23  together with reasonable attorneys' fees, pursuant to 15 U.S.C. § 1691e(d) and/or 42 U.S.C. §

24  3613(c); and

25    j.    Grant Plaintiffs and the Class such other and further relief as this Court finds

26  necessary and proper.

27

28

1

## JURY TRIAL DEMANDED

2
Plaintiffs demand a trial by jury on all issues so triable.

3
Respectfully submitted,
On Behalf of the Plaintiffs,

4

5
Dated: May 30, 2008

/s/ Alan R. Plutzik
SCHIFFRIN BARROWAY TOPAZ &
KESSLER, LLP

6

7
Alan R. Plutzik, Of Counsel (Bar No. 077785)
Robert M. Bramson, Of Counsel (Bar No. 102006)
2125 Oak Grove Road, Suite 120
Walnut Creek, California 94598
Telephone: (925) 945-0770
Facsimile: (925) 945-8792

8

9

10

11
-and-

12
Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Joseph A. Weeden, Esq.
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

13

14

15

16
Gary Klein
Shennan Kavanagh
Kevin Costello
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA 02111-2810
Telephone: (617) 357-5500 ext. 15
Facsimile: (617) 357-5030

17

18

19

20
Marvin A. Miller
Matthew E. VanTine
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400

21

22

23

24
Stuart Rossman
Charles Delbaum
NATIONAL CONSUMER LAW CENTER
77 Summer Street, 10th Flr.
Boston, MA 02141
Telephone:    (617) 542-8010
Facsimile:    (617) 542-8028

25

26

27

28

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
AND THE SOCIAL JUSTICE PROJECT, INC.
208 S. LaSalle Street, Suite #1650
Chicago, IL 60604
Phone (312) 345-1004
Fax (312) 346-3242

Samuel H. Rudman
Robert M. Rothman
Mark S. Reich
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*EXHIBIT 1*

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

**Borrower:**
CLAUDIA P. SIERRA
5 CONDOR STREET Unit # 2
EAST BOSTON, MA 02128

**Creditor:**
FIRST FRANKLIN FINANCIAL CORP.,
AN OP. SUB. OF MLB&T CO., FSB
2150 NORTH FIRST STREET
SAN JOSE, CA 95131

Loan Number: 4001320087

Date: 03/08/2007

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after your have made all payments as scheduled. |
| 10.5478% | $661,853.49 | $221,417.20 | $883,270.69 |

Your payment schedule will be:

| No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin | No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin | No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin |
|---|---|---|---|---|---|---|---|---|
| 24 | $1,611.03 | 05/01/2007 | | | | | | |
| 335 | $2,063.30 | 05/01/2009 | | | | | | |
| 1 | $153,400.47 | 04/01/2037 | | | | | | |

VARIABLE RATE: Your loan contains a variable-rate feature. Disclosures about the variable-rate feature have been provided to you earlier.

INSURANCE: The following insurance is required to obtain credit:     *Property
   You may obtain the insurance from anyone that is acceptable to creditor.

SECURITY: You are giving a security interest in the real property being purchased.
   Property address: 5 CONDOR STREET, Unit# 2, EAST BOSTON, MA  02128

LATE CHARGE:  If a payment is more than 15 days late, you will be charged 3.0000% of the payment.

PREPAYMENT: If you pay off your loan early,  * You will not have to pay a penalty.
   * You will not be entitled to a refund of part of the finance charge.

ASSUMPTION: Someone buying your property may assume the remainder of your loan on the original terms.
THE ANNUAL PERCENTAGE RATE (APR) IS NOT THE SAME AS THE INTEREST RATE (NOTE RATE) OF THE MORTGAGE FOR WHICH
YOU APPLIED. THE NOTE RATE DESCRIBES ONLY THE INTEREST. THE APR, WHICH IS USUALLY HIGHER, INCLUDES OTHER
ITEMS SUCH AS DISCOUNT POINTS, FEES, FINANCE CHARGES AND CERTAIN OTHER CHARGES WHICH ARE REQUIRED TO BE PAID
TO OBTAIN THE LOAN.

See your contract documents for any additional information about nonpayment, default, any required repayment
in full before the scheduled date, and prepayment refunds and penalties.

CLAUDIA P. SIERRA                                   DATE

*EXHIBIT 2*

A. **Settlement Statement**

U.S. Department of Housing
And Urban Development

OMB Approval No. 2502-0265

**B.  Type of Loan**

| 1. | ☐ | FHA | 2. | ☐ | FmHA | 3. | ☐ | Conv. Unins. | 6. File Number: | 7. Loan Number: | 8. Mortage Ins. Case No.: |
| 4. | ☐ | VA | 5. | ☐ | Conv. Ins. | | | | | 4001320087 | |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

**D. Name and Address of Borrower:**
Claudia P. Sierra, 55 Eleanor St, #10, Chelsea, MA 02150

**E. Name and Address of Seller:**
Juan A. Velasquez, 5 Condor Street, Unit # 3, Boston, MA 02128

Seller's TIN#:

**G. Property Location:**
5 Condor Street, Unit # 2
Boston, MA 02128

**F. Name and Address of Lender:**
First Franklin Loan Services on behalf of First Frankli
600 West Cummings Park Suite 2600
Woburn, MA, 01801

**H. Settlement Agent:**   Summers & Summers

**Place of Settlement:**   224 Clarendon Street, Boston, MA 02116

04-2456870

**I. Settlement Date:**

City/City of Settlement: Boston          Suffolk

March 8, 2007

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract sales price | $285,000.00 | 401. Contract sales price | $285,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | $8,602.35 | 403. | |
| 104. 4th Quarter Taxes - City of Boston | $170.03 | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes    3/8/2007  to   3/31/2007 | $71.76 | 406. City/town taxes   3/8/2007  to   3/31/2007 | $71.76 |
| 107. County taxes       to | | 407. County taxes       to | |
| 108. Assessments        to | | 408. Assessments        to | |
| 109.   Condo Fee Adjustment 3/8/07 - 3/31/2007 | $89.01 | 409.  Condo Fee Adjustment 3/8/07 - 3/31/2007 | $89.01 |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross Amount Due From Borrower** | $293,933.15 | **420. Gross Amount Due To Seller** | $285,160.77 |
| **200. Amounts Paid By Or in Behalf Of Borrower** | | **500. Reductions in Amount Due To Seller** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | $228,000.00 | 502. Settlement charges to seller (line 1400) | $1,824.80 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204.  Proceeds from 2nd Loan | $55,666.30 | 504. Payoff 1   Countrywide Home Loans, Inc. | $201,232.32 |
| 205. | | 505. Payoff 2 | |
| 206. | | 506.             to | |
| 207. | | 507.             to | |
| 208. | | 508.             to | |
| 209. | | 509.             to | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes       to | | 510. City/town taxes       to | |
| 211. County taxes          to | | 511. County taxes          to | |
| 212. Assessments           to | | 512. Assessments           to | |
| 213.   Seller Closing Cost Credit | $10,000.00 | 513.   Seller Closing Cost Credit | $10,000.00 |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | $293,666.30 | **520. Total Reduction Amount Due Seller** | $213,056.92 |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross amount due from borrower (line 120) | $293,933.15 | 601. Gross amount due to seller (line 420) | $285,160.77 |
| 302. Less amount paid by/for borrower (line 220) | ($293,666.30) | 602. Less amount paid by/for seller (line 520) | ($213,056.92) |
| **303. CASH   ☐ FROM  ☐ TO   BORROWER:** | $266.85 | **603. CASH   ☐ TO  ☐ FROM  SELLER:** | $72,103.85 |

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained in Blocks E,G,H and I and on line 401 (or if line 401 is asterisked, lines 403 and 404) is important tax information and is being furnished to the Internal Revenue Service.
If you are required to file a return, a negligence penalty or other sanction will be imposed on you, if this item is required to be reported and the IRS determines that it has not been reported.
SELLER INSTRUCTIONS: If this real estate was your principal residence, file Form 2110. Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040). You are required by law to provide (see box H) with your correct taxpayer identification number. If you do not provide (see box H) with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law, and under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

_____
Seller's Signature

**L. Settlement Charges**

| 700. Total Sales/Broker's Commission based on price | $285,000.00 @ | % = | | Paid From Borrowers Funds at Settlement | Paid From Sellers Funds at Settlement |
|---|---|---|---|---|---|
| Division of Commission (line 700) as follows: | | | | | |
| 701. | to | | | | |
| 702. | to | | | | |
| 703. Commission paid at Settlement | | | | | |
| 704. | | | | | |
| **800. Items Payable in Connection With Loan** | | | | | |
| 801. Loan Origination fee | % | | POC: | | |
| 802. Loan Discount | % | | POC: | | |
| 803. Appraisal Fee | to | Didarul A. Salam | POC: $300.00 | | |
| 804. Administration Fee | to | First Franklin Financial Corp | POC: | $695.00 | |
| 805. Wire Transfer Fee | to | First Franklin Financial Corp | POC: | $5.00 | |
| 806. Flood Cert | to | FIS Flood Services | POC: | $9.00 | |
| 807. Tax Service | to | First Franklin Financial Corp | POC: | $72.00 | |
| 808. Processing Fee | to | Mortgage Trust Group | POC: | $450.00 | |
| 809. Application Fee | to | Mortgage Trust Group | POC: | $330.00 | |
| 810. Broker Fee | to | Mortgage Trust Group | POC: | $2,850.00 | |
| 811. Broker Fee pd by Lender | to | Mortgage Trust Group | POC: $2,736.00 | | |
| 812. | to | | POC: | | |
| 813. MAVENT | to | First Franklin Financial Corp | POC: | $15.50 | |
| 814. Review Appraiser | to | Strickland, Marguerite | POC: | $225.00 | |
| 815. | to | | POC: | | |
| **900. Items Required By Lender To Be Paid In Advance** | | | | | |
| 901. Interest from | 3/8/2007 to 4/1/2007 @ | 51.6167 / day 24 Days | | $1,238.80 | |
| 902. Mortgage insurance premium for | mo. to | | | | |
| 903. Hazard insurance premium for | yrs. to | | | | |
| 904. Flood Insurance | yrs. to | | | | |
| 905. | | | | | |
| **1000. Reserves Deposited With Lender** | | | | | |
| 1001. Hazard insurance | months @ | per month | | | |
| 1002. Mortgage insurance | months @ | per month | | | |
| 1003. City property taxes | 4 months @ | $90.95 per month | | $363.80 | |
| 1007. | months @ | per month | | | |
| 1008. Aggregate Accounting Adjustment | | | | | |
| **1100. Title Charges** | | | | | |
| 1101. Settlement or closing fee to | | | | | |
| 1102. Abstract or title search to | | | | | |
| 1103. Title examination to | Thomas O'Connor Day & Associates | | | $100.00 | |
| 1104. Title insurance binder to | | | | | |
| 1105. Document preparation to | | | | | |
| 1106. Notary fees to | | | | | |
| 1107. Attorney's fees to | Summers & Summers | | | $650.00 | |
| (includes above items Numbers: | | | ) | | |
| 1108. Title insurance to | Old Republic National Title Insurance Company | | | $1,215.25 | |
| Includes the above items numbers: | | | ) | | |
| 1109. Lender's coverage | $228,000.00 L Prem: $670.00 Endorsement | | | | |
| 1110. Owner's coverage | $285,000.00 O Prem: $645.25 | | | | |
| 1111. Obtain Mortgage Discharge(s) | to | Summers & Summers | | | $100.00 |
| 1112. | to | | | | |
| 1113. Title Ins. Commission to Title Agent | $850.68 to | Summers & Summers | | | |
| **1200. Government Recording and Transfer Charges** | | | | | |
| 1201. Recording fees: | Deed $125.00 ; Mortgage $175.00 ; Releases $75.00 | | | $300.00 | $75.00 |
| 1202. City/county tax/stamps: | Deed ; Mortgage | | | | |
| 1203. State tax/stamps: | Deed $1,299.60 ; Mortgage | | | | $1,299.60 |
| 1204. Rundown & Record Fee | to | Thomas O'Connor Day & Associates | | $50.00 | |
| 1205. Record 6(d) Certificate | to | Registry of Deeds | | | $75.00 |
| **1300. Additional Settlement Charges** | | | | | |
| 1301. Survey to | N/A | | | | |
| 1302. Pest inspection to | | | | | |
| 1303. Deed Prep Fee | to | Summers & Summers | | | $250.00 |
| 1304. Overnight Closing Package to Lender | to | UPS | | $25.00 | |
| 1305. Overnight Payoff | to | UPS | | | $25.00 |
| 1306. Courier Fee | to | Peter Collins | | $8.00 | |
| 1307. | to | | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502 Section K)** | | | | $8,602.35 | $1,824.60 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrowers _____   Sellers _____

Claudia P. Sierra                    Juan A. Velasquez

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement

Settlement Agent _____                    Date   March 8, 2007

Anthony Summers

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

form HUD-1 (3/86)

*EXHIBIT 3*

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

**Borrower:**
CLAUDIA P. SIERRA
5 CONDOR STREET Unit # 2
EAST BOSTON, MA 02128

**Creditor:**
FIRST FRANKLIN FINANCIAL CORP.,
AN OP. SUB. OF MLB&T CO., FSB
2150 NORTH FIRST STREET
SAN JOSE, CA 95131

Loan Number: 4001320088

Date: 03/08/2007

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after your have made all payments as scheduled. |
| 11.4054% | $90,808.15 | $55,996.30 | $146,804.45 |

Your payment schedule will be:

| No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin | No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin | No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin |
|---|---|---|---|---|---|---|---|---|
| 179 | $549.29 | 05/01/2007 | | | | | | |
| 1 | $48,481.54 | 04/01/2022 | | | | | | |

INSURANCE: The following insurance is required to obtain credit:    *Property
You may obtain the insurance from anyone that is acceptable to creditor.

SECURITY: You are giving a security interest in the property you already own.
Property address: 5 CONDOR STREET, Unit# 2, EAST BOSTON, MA  02128

LATE CHARGE:  If a payment is more than 10 days late, you will be charged 10.0000% of the payment,
not less than $40.00.

PREPAYMENT: If you pay off your loan early,  * You will not have to pay a penalty.
* You will not be entitled to a refund of part of the finance charge.

ASSUMPTION: Someone buying your property cannot assume the remainder of your loan on the  original terms.
THE ANNUAL PERCENTAGE RATE (APR) IS NOT THE SAME AS THE INTEREST RATE (NOTE RATE) OF THE MORTGAGE FOR WHICH
YOU APPLIED. THE NOTE RATE DESCRIBES ONLY THE INTEREST. THE APR, WHICH IS USUALLY HIGHER, INCLUDES OTHER
ITEMS SUCH AS DISCOUNT POINTS, FEES, FINANCE CHARGES AND CERTAIN OTHER CHARGES WHICH ARE REQUIRED TO BE PAID
TO OBTAIN THE LOAN.

See your contract documents for any additional information about nonpayment, default, any required repayment
in full before the scheduled date, and prepayment refunds and penalties.

CLAUDIA P. SIERRA                                                    3-8-07
                                                                    DATE

*EXHIBIT 4*

A  Settlement Statement

**U.S Department of Housing And Urban Development**

OMB Approval No. 2502-0265

**B  Type of Loan**

| 1 | FHA | 2 | FmHA | 3 | Conv. Unins. | 6. Loan Number: 4001320058 | 8. Mortgage Ins. Case No.: |
| 4 | VA | 5 | Conv. Ins. | | | 7. Loan Number: 4001320058 | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown here for informational purposes and are not included in the totals. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. Name and Address of Borrower:
Claudio P. Sierra, 55 Eleanor Street #10, Chelsea, MA 02150

E. Name and Address of Seller

F. Name and Address of Lender:
First Franklin Loan Services on behalf of First Franklin
600 West Cummings Park, Suite 2600
Woburn, MA 01801

Seller's TIN#:

G. Property Location:
5 Condor Street, Unit # 2
Boston, MA 02128

H. Settlement Agent: Summers & Summers

04-2458870

Place of Settlement: 224 Clarendon Street, Boston, MA 02116

I. Settlement Date:
March 8, 2007

City/City of Settlement: Boston    Suffolk

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due From Borrower | | 400. Gross Amount Due To Seller | |
| 101. Contract sales price | $0.00 | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | $1,333.70 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes          to | | 406. City/town taxes          to | |
| 107. County taxes            to | | 407. County taxes            to | |
| 108. Assessments            to | | 408. Assessments            to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross Amount Due From Borrower** | **$1,333.70** | **420. Gross Amount Due To Seller** | |
| 200. Amounts Paid By Or In Behalf Of Borrower | | 500. Reductions In Amount Due To Seller | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | $57,000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff 1 | |
| 205. | | 505. Payoff 2 | |
| 206. | | 506.          to | |
| 207. | | 507.          to | |
| 208. | | 508.          to | |
| 209. | | 509.          to | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes          to | | 510. City/town taxes          to | |
| 211. County taxes            to | | 511. County taxes            to | |
| 212. Assessments            to | | 512. Assessments            to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | **$57,000.00** | **520. Total Reduction Amount Due Seller** | |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross amount due from borrower (line 120) | $1,333.70 | 601. Gross amount due to seller (line 420) | |
| 302. Less amount paid by/for borrower (line 220) | ($57,000.00) | 602. Less amount paid by/for seller (line 520) | |
| **303. CASH    FROM ● TO    BORROWER:** | **$55,666.30** | **603. CASH    TO ●/FROM    SELLER:** | |

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained in Blocks E,G,H and I and on line 401 (or if line 401 is asterisked, lines 403 and 404) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you, if this item is required to be reported and the IRS determines that it has not been reported.
SELLER INSTRUCTIONS: If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040). You are required by law to provide (see box H) with your correct taxpayer identification number. If you do not provide (see box H) with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law, and under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

Seller's Signature

| 700. Total Sales/Broker's Commission based on price | | $0.00 @ | % = | | Paid From Borrowers Funds at Settlement | Paid From Sellers Funds at Settlement |
|---|---|---|---|---|---|---|
| Division of Commission (line 700) as follows: | | | | | | |
| 701. | to | | | | | |
| 702. | to | | | | | |
| 703. Commission paid at Settlement | | | | | | |
| 704. | | | | | | |
| **800. Items Payable in Connection with Loan** | | | | | | |
| 801. Loan Origination fee | % | | | | | |
| 802. Loan Discount | % | | | POC: | | |
| 803. Administration Fee | | to First Franklin Financial Corp. | | POC: | | |
| 804. Wire Transfer Fee | | to First Franklin Financial Corp | | POC: | $395.00 | |
| 805. Flood Cert Fee | | to First Franklin Financial Corp | | POC: | $6.00 | |
| 806. MAVENT | | to First Franklin Financial Corp | | POC: | $5.00 | |
| 807. | | to | | POC: | $12.50 | |
| 808. | | to | | POC: | | |
| 809. | | to | | POC: | | |
| 810. | | to | | POC: | | |
| 811. | | to | | POC: | | |
| 812. | | to | | POC: | | |
| 813. | | to | | POC: | | |
| 814. | | to | | POC: | | |
| 815. | | to | | POC: | | |
| **900. Items Required By Lender To Be Paid In Advance** | | | | | | |
| 901. Interest from | 3/8/2007 to | 4/1/2007 @ | 17.6542 / day 24 | Days | $423.70 | |
| 902. Mortgage insurance premium for | | mo. to | | | | |
| 903. Hazard insurance premium for | | yrs. to | | | | |
| 904. Flood insurance | | yrs. to | | | | |
| 905. | | | | | | |
| **1000. Reserves Deposited With Lender** | | | | | | |
| 1001. Hazard insurance | | months @ | per month | | | |
| 1002. Mortgage insurance | | months @ | per month | | | |
| 1003. City property taxes | | months @ | per month | | | |
| 1007. | | months @ | per month | | $0.00 | |
| 1008. Aggregate Accounting Adjustment | | | | | | |
| **1100. Title Charges** | | | | | | |
| 1101. Settlement or closing fee to | | | | | | |
| 1102. Abstract or title search to | | | | | | |
| 1103. Title examination to | | | | | | |
| 1104. Title insurance binder to | | | | | | |
| 1105. Document preparation to | | | | | | |
| 1106. Notary fees to | | | | | | |
| 1107. Attorney's fees to | Summers & Summers | | | | $160.00 | |
| (includes above items Numbers: | | | | | | |
| 1108. Title insurance to | Old Republic National Title Insurance Company | | | } | $142.50 | |
| includes the above items numbers: | | | | | | |
| 1109. Lender's coverage $57,000.00 | L Prem: $142.50 Endorsement | | | } | | |
| 1110. Owner's coverage $0.00 | O Prem: | | | | | |
| 1111. | | to | | | | |
| 1112. | | to | | | | |
| 1113. Title Ins. Commission to Title Agent | $99.75 to Summers & Summers | | | | | |
| **1200. Government Recording and Transfer Charges** | | | | | | |
| 1201. Recording fees: Deed | ; Mortgage $175.00 | ; Releases | | | $175.00 | |
| 1202. City/county tax/stamps: Deed | ; Mortgage | | | | | |
| 1203. State tax/stamps: Deed | $0.00 ; Mortgage | | | | | |
| 1204. | | to | | | | |
| 1205. | | to | | | | |
| **1300. Additional Settlement Charges** | | | | | | |
| 1301. Survey to NVA | | | | | | |
| 1302. Pest Inspection to | | | | | | |
| 1303. Overnight Closing Package to Lender | to UPS | | | | $25.00 | |
| 1304. | | to | | | | |
| 1305. | | to | | | | |
| 1306. | | to | | | | |
| 1307. | | to | | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502 Section K)** | | | | | $1,533.70 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrowers                                                                  Sellers

Claudia P. Sierra

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent

Anthony Summers                                    Date     March 8, 2007

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

Page 2 of 2                                                                  form HUD-1 (3/86)

*EXHIBIT 5*

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

**Borrower:**
LILLIAN SERGENTON
5948 SOUTH KING DRIVE  Unit # 3
CHICAGO, IL 60637

**Creditor:**
FIRST FRANKLIN
A DIVISION OF NAT. CITY BANK OF IN
2150 NORTH FIRST STREET
SAN JOSE, CA  95131

Loan Number: 4000583296

Date: 12/15/2005

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after your have made all payments as scheduled. |
| 11.2868% | $605,306.77 | $234,988.62 | $840,295.39 |

Note Rate:      9.6250%                          Loan Amount:    $241,000.00

Your payment schedule will be:

| No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin | No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin | No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin |
|---|---|---|---|---|---|---|---|---|
| 24 | $2,048.47 | 02/01/2006 | | | | | | |
| 335 | $2,354.54 | 02/01/2008 | | | | | | |
| 1 | $2,381.21 | 01/01/2036 | | | | | | |

VARIABLE RATE: Your loan contains a variable-rate feature.  Disclosures about the variable-rate feature have been provided to you earlier.

INSURANCE:  The following insurance is required to obtain credit:     *Property
   You may obtain the insurance from anyone that is acceptable to creditor.

SECURITY: You are giving a security interest in the real property being purchased.
   Property address: 5948 SOUTH KING DRIVE , Unit# 3, CHICAGO, IL  60637

LATE CHARGE:  If a payment is more than 15 days late, you will be charged 5.0000% of the payment.

PREPAYMENT: If you pay off your loan early,  * You will not have to pay a penalty.
   * You will not be entitled to a refund of part of the finance charge.

ASSUMPTION: Someone buying your property may assume the remainder of your loan on the original terms.
THE ANNUAL PERCENTAGE RATE (APR) IS NOT THE SAME AS THE INTEREST RATE (NOTE RATE) OF THE MORTGAGE FOR WHICH
YOU APPLIED. THE NOTE RATE DESCRIBES ONLY THE INTEREST. THE APR, WHICH IS USUALLY HIGHER, INCLUDES OTHER
ITEMS SUCH AS DISCOUNT POINTS, FEES, FINANCE CHARGES AND CERTAIN OTHER CHARGES WHICH ARE REQUIRED TO BE PAID
TO OBTAIN THE LOAN.

See your contract documents for any additional information about nonpayment, default, any required repayment
in full before the scheduled date, and prepayment refunds and penalties.

LILLIAN SERGENTON                        12-15-05
                                          DATE
                                         12-15-05
                                          DATE

**EXHIBIT 6**

12/15/05 12:04 PM

| A. U.S. Department of Housing and Urban Development | | OMB No. 2502-0265 |
|---|---|---|

| | B. Type of Loan | | |
|---|---|---|---|
| | 1. [ ] FHA | 2. [ ] FMHA | 3. [ ] Conv. Unins. |
| | 4. [ ] VA | 5. [ ] Conv. Ins. | [X] Other. |
| | 6. File Number | | 7. Loan Number |
| **Settlement Statement** | 451214 | | 4000583298 |
| | 8. Mortgage Ins. Case No. | | |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked ("POC") were paid outside the closing; they are shown here for information purposes and are not included in the totals.

**D. Name of Borrower:** Lillian Sorgeaton

**E. Name of Seller:** Forsit Properties LLC                                                             TIN:

**F. Name of Lender:** First Franklin A Division of National City bank of Indiana

**G. Property Location:** 5645 South King Drive, Condominium 3, Chicago, IL 60637

**H. Settlement Agent:** Stewart Title of Illinois

**Place of Settlement:** 2 N. LaSalle Suite 625 Chicago IL 60602                    TIN: 36-3849696

**I. Settlement Date:** 12/15/2005                    Proration Date: 12/15/2005

| 100. | Gross amount due from borrower: | | 400. | Gross amount due to seller: | |
|---|---|---|---|---|---|
| 101. | Contract sales price | 241,000.00 | 401. | Contract sales price | 241,000.00 |
| 102. | Personal property | | 402. | Personal property | |
| 103. | Settlement charges to borrower: (line 1400) | 8,520.62 | 403. | | |
| 104. | | | 404. | | |
| 105. | | | 405. | | |
| 106. | City/town taxes | | 406. | City/town taxes | |
| 107. | County taxes | | 407. | County taxes | |
| 108. | Assessments    12/15/2005  to 1/1/2006 | 96.96 | 408. | Assessments    12/15/2005  to 1/1/2006 | 96.96 |
| 109. | | | 409. | | |
| 110. | | | 410. | | |
| 111. | | | 411. | | |
| 112. | | | 412. | | |
| 120. | Gross amount due from borrower: | 249,617.58 | 420. | Gross amount due to seller: | 241,096.96 |
| 201. | Deposit or earnest money | 1,000.00 | 501. | Excess deposit (see instructions) | |
| 202. | Principal amount of new loan(s) | 241,000.00 | 502. | Settlement charges to seller (line 1400) | 13,265.50 |
| 203. | Existing loan(s) taken subject to | | 503. | Existing loan(s) taken subject to | |
| 204. | | | 504. | Payoff of first mortgage loan Mercantile National Bar | 160,000.00 |
| 205. | | | 505. | Payoff of second mortgage loan | |
| 206. | | | 506. | | |
| 207. | Closing Cost Credit | 2,500.00 | 507. | Closing Cost Credit | 2,500.00 |
| 208. | Broker Credit | 1,000.00 | 508. | | |
| 209. | | | 509. | | |
| 210. | City/town taxes | | 510. | City/town taxes | |
| 211. | County taxes    1/1/2005  to 12/15/2005 | 366.45 | 511. | County taxes    1/1/2005  to 12/15/2005 | 366.45 |
| 212. | Assessments | | 512. | Assessments | |
| 213. | | | 513. | | |
| 214. | | | 514. | | |
| 215. | | | 515. | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |
| 219. | | | 519. | | |
| 220. | Total paid by/for borrower: | 245,866.45 | 520. | Total reduction in amount due seller: | 176,131.95 |
| 301. | Gross amount due from borrower (line 120) | 249,617.58 | 601. | Gross amount due to seller (line 420) | 241,096.96 |
| 302. | Less amount paid by/for borrower (line 220) | 245,866.45 | 602. | Less total reduction in amount due seller (line 520) | 176,131.95 |
| 303. | CASH [ ]FROM [ ]TO BORROWER | 3,751.13 | 603. | CASH [ ]FROM [X]TO SELLER | 64,965.01 |

**SUBSTITUTE FORM 1099 SELLER STATEMENT** - The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. **SELLER INSTRUCTION** - if this real estate was your principle residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide Stewart Title of Illinois with your correct taxpayer identification number.

If you do not provide Stewart Title of Illinois with your correct taxpayer identification number, you may be subject to civil or criminal penalties.

Forsit Properties LLC

the seller in ti

| | | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|---|
| 700. | Total sales/broker commission | based on : $241,000.00 = $12,050.00 | | | |
| | Division of commission (line 700) as follows: | | | | |
| 701. | $12,050.00 | to | Coldwell Banker | | |
| 702. | | | | | |
| 703. | Commission paid at settlement $12,050.00 | | | | |
| 704. | $1,000.00 earnest money retained by Listing Broker as POC. | | | | 12,050.00 |
| 801. | Loan origination fee | to | American Home Mortgage ( | | |
| 802. | Loan discount | | | 2,410.00 | |
| 803. | Appraisal fee | to | American Home Mortgage Corp. | POCB 275.00 | |
| 804. | Credit report | to | American Home Mortgage Corp. | POCB 8.25 | |
| 805. | Lender's inspection fee | | | | |
| 806. | Mortgage insurance application fee | | | | |
| 807. | Assumption fee | | | | |
| 808. | Lender Pd Broker Fee | to | American Home Mortgage Corp. | POCL 2410.00 | |
| 809. | Admin Fee | to | First Franklin A Division of National City bank of In | | |
| 810. | Appraisal Review Fee | to | First Franklin A Division of National City bank of In | 599.00 | |
| 811. | Tax Service Fee | to | First Franklin A Division of National City bank of In | 200.00 | |
| 812. | Flood Cert Fee | to | Fidelity National Flood | 69.00 | |
| 813. | Compliance Review Fee | to | First Franklin A Division of National City bank of In | 23.00 | |
| 814. | | | | 15.00 | |
| 815. | | | | | |
| 901. | Interest from | 12/15/2006 to 1/1/2006 | at $64.4300/day for 17 days. | | |
| 902. | Mortgage insurance premium for | | | 1,095.38 | |
| 903. | Hazard insurance premium for | | | | |
| 904. | | | | | |
| 905. | | | | | |
| 1001. | Hazard insurance | | | | |
| 1002. | Mortgage insurance | | | | |
| 1003. | City property taxes | | | | |
| 1004. | County property taxes | | | | |
| 1005. | Annual assessments (maint.) | | | | |
| 1006. | | | | | |
| 1007. | | | | | |
| 1008. | | | | | |
| 1009. | | | | | |
| 1101. | Settlement or closing fee | to | Stewart Title of Illinois | | |
| 1102. | Abstract or title search | | | 435.00 | |
| 1103. | Title examination | | | | |
| 1104. | Title insurance binder | | | | |
| 1105. | Document preparation | | | | |
| 1106. | Notary fees | | | | |
| 1107. | Attorney's fees to | | Jaffe & Berlin | | |
| | Includes above items no.: | | | | 550.00 |
| 1108. | Title insurance | to | Lincoln Title Company/ Jaffe & Berlin | 285.00 | 250.00 |
| | Includes above items no.: | | | | |
| 1109. | Lender's coverage | | $265.00 | | |
| 1110. | Owner's coverage | $241,000.00 | $250.00 | | |
| 1111. | Epw/Condo End | to | Lincoln Title Company/ Jaffe & Berlin | | |
| 1112. | Update Fee | to | Lincoln Title Company/ Jaffe & Berlin | 230.00 | |
| 1113. | P/O Pkg Processing Fee | to | Lincoln Title Company/ Jaffe & Berlin | 95.00 | |
| 1114. | Stat Policy Fee | to | Stewart Title of Illinois | 15.00 | 15.00 |
| 1115. | E-Mail Fee | to | Stewart Title of Illinois | 3.00 | 3.00 |
| 1116. | Chain of Title | to | Lincoln Title Company/ Jaffe & Berlin | 25.00 | |
| | | | | 115.00 | |
| 1201. | Recording fees/ Surcharge fees: | Deed $35.00 Mortgage $80.00 Release $35.00 | | | |
| 1202. | City/county tax/stamps: | Deed $120.50 | | 115.00 | 35.00 |
| 1203. | State tax/stamps: | Deed $241.00 | | | 120.50 |
| 1204. | Chicago Transfer Stamps | Deed $1807.50 | | | 241.00 |
| 1205. | | | | 1,807.50 | |
| 1206. | | | | | |
| 1301. | Survey | | | | |
| 1302. | Pest Inspection | | | | |
| 1303. | 2 Month Start Up Deposit | to | Courtyard on the Park Condominium Association | | |
| 1304. | Insurance Premium | to | Forall Properties LLC | 363.54 | |
| 1305. | Attorney's Fees | to | Marjorie Fortner | 19.20 | |
| 1306. | | | | 500.00 | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | | | 8,520.62 | 13,265.50 |